***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Parties are subject to the North Carolina Workers' Compensation Act.
2. An Employee-Employer relationship existed between the named Employee and the named Employer.
3. The Carrier liable on the risk on May 5, 2003, and May 20, 2003 is ACE/USA.
4. The Employee's average weekly wage is $407.19 yielding a weekly compensation rate of $271.46.
5. Plaintiff has not returned to work with Defendant-Employer.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on April 3, 1963, and was forty years old as of the date of the hearing before the Deputy Commissioner. She was employed by Defendant-Employer as a Certified Nursing Assistant I during all times relevant to her workers' compensation claims. Defendant-Employer is a healthcare facility, which cares for residents of various functioning levels.
2. Plaintiff's physical job duties with Defendant-Employer included passing food trays and feeding residents, grooming, dressing, undressing, changing residents' garments, preparing residents for bed, helping residents in and out of bed, keeping residents' surroundings clean, and transporting residents to the dining room and other areas.
3. Plaintiff testified that she sustained an injury on May 5, 2003, and again on May 20, 2003. Defendants denied Plaintiff's workers compensation claims via a Form 61 on May 28, 2003. The issues considered at the hearing before the Deputy Commissioner were: (1) Whether Plaintiff-Employee sustained an injury by accident as defined by the North Carolina Workers' Compensation Act; (2) Whether Plaintiff-Employee's alleged injury by accident arose out of and in the course and scope of her employment; (3) Whether Plaintiff-Employee was disabled as a result of the alleged injury by accident; (4) Whether Plaintiff-Employee is entitled to payment of temporary total disability benefits and/or temporary partial disability benefits and medical treatment as a result of her alleged injuries of May 5, 2003, and May 20, 2003; and (5) Whether Plaintiff-Employee is entitled to attorney fees and costs pursuant to N.C. Gen. Stat. § 97-88.1, for Defendants' litigiousness in defending this claim.
4. On May 5, 2003, Plaintiff was helping assist a family member of a resident with removing the resident's sweat pants. The resident was lying flat in bed and was physically unable to turn on her own. The family member was struggling to remove the resident's sweat pants, so Plaintiff assisted by grabbing the bed-pad under the resident at each corner to help bring the resident closer toward the family member. As Plaintiff grabbed the pad, she felt a pop in her left wrist below the thumb. Plaintiff filed a written accident report.
5. On May 6, 2003, Defendant-Employer sent Plaintiff to Eastland Urgent Care, where she complained of pain in her left wrist and the development of a knot. The physician at Eastland Urgent Care diagnosed Plaintiff with a wrist sprain and ganglion cyst and advised Plaintiff to wear a wrist splint. Plaintiff was written out of work until May 10, 2003.
6. Plaintiff returned to Eastland Urgent Care on May 10, 2003, still complaining of pain in her left wrist. The physician found that Plaintiff was tender at the base of her thumb and that the ganglion cyst was painful. Plaintiff was referred to an orthopedist for further treatment and written out of work until "cleared by orthopedist."
7. On May 12, 2003, Plaintiff was instructed by Defendants to see Dr. Roger Hershline. Dr. Hershline, who works at WorkWell, diagnosed Plaintiff with a minor thumb strain, instructed her to wear a wrist splint and ice her hand twice a day, and returned her to modified work from May 13, 2003 through May 27, 2003.
8. On May 20, 2003, still on restricted duties and wearing a wrist splint on her left arm, Plaintiff was given a list of residents who needed vital signs taken. She had to take the residents' blood pressure manually because the automatic pressure cuff was broken. Plaintiff's right hand was feeling more and more painful due to repeatedly squeezing the blood pressure machine's bulb. Plaintiff's blood pressure was high, so Bertha Dorsey, the charge nurse, told her to sit down. Plaintiff sat until it was time for dinner. The food cart arrived and Plaintiff and another employee began passing food trays to residents. Plaintiff was struggling to hold the trays. She could have managed if she held the trays close to her body, however, she was not allowed to do so pursuant to health regulations. Instead, she tried to hold the trays normally and almost dropped the trays. Her right wrist was very painful. Plaintiff called her supervisor and showed it to her. The supervisor advised Plaintiff to go to the emergency room.
9. Plaintiff went to the Presbyterian Hospital Emergency Room on May 20, 2003, for right wrist pain. She was instructed to rest, ice the area for thirty-minute time periods over the course of the next forty-eight hours, and wear splints at work and during sleep. She was advised to return to WorkWell for further treatment.
10. Plaintiff returned to Dr. Hershline on May 21, 2003. She reported that her right wrist began hurting while she was obtaining a resident's vital signs and while lifting a tray to give to one of the residents. Dr. Hershline reported that there were cysts on both wrists, but otherwise her right wrist appeared normal and there was no swelling. Dr. Hershline noted that there was no specific injury and that her cysts and arthritic pain were not work related.
11. Although Plaintiff was still having pain and swelling in her wrists, Dr. Hershline released Plaintiff to full duty on May 21, 2003.
12. Due to continued pain and swelling in her wrists, Plaintiff sought additional medical treatment with Dr. Lois Osier of Charlotte Orthopedic Specialists on May 23, 2003. Dr. Osier is board certified in orthopedics and is a hand and microsurgery specialist. Dr. Osier diagnosed Plaintiff with "severe left wrist de Quervain's tendinitis, work related with associated ganglion cyst" and "moderate right de Quervain's tendinitis, work related."
13. Dr. Osier opined that Plaintiff's symptoms on the left wrist "correlate with her account of how her pain began with having to use her thumb to lift and push the patient." She further stated that Plaintiff's right wrist developed moderate changes over the first dorsal compartment brought on by substituting use of her right hand for the left hand. On May 23, 2003, Dr. Osier wrote Plaintiff out of work through June 17, 2003, and gave her a cortisone injection. Dr. Osier prescribed Vicodin for pain and instructed Plaintiff to use a D-Ring thumb Spica brace for the left wrist condition.
14. Dr. Osier testified that de Quervain's tendinitis could be the result of trauma or repetitive use of the thumb. She further testified that ganglion cysts could be brought on spontaneously or by trauma.
15. On or about May 27, 2003, Plaintiff received a letter from Rusty Mitchell, the Administrator at Defendant-Employer, informing her that they had to remove her from the active schedule until she could return to work "full duty with no restrictions." Plaintiff understood this letter to mean that she was being replaced or terminated because she could not perform her job duties. Plaintiff testified that she never returned to work with Defendant-Employer.
16. On June 6, 2003, Plaintiff returned to Dr. Osier and reported a decrease in the pain in her left hand and wrist although she still had pain in her left thumb. She also continued to complain of pain in the right hand and wrist. Dr. Osier performed another injection and wrote Plaintiff out of work until July 15, 2003.
17. On July 14, 2003, Dr. Osier examined Plaintiff who reported a marked increase in her pain. She also reported swelling over the left wrist and pain in the right wrist. She complained of aching and tingling radiating up to her elbow in both arms. Dr. Osier recommended surgical intervention to the left wrist. She was given another injection. Dr. Osier restricted Plaintiff from all work for three months. Plaintiff underwent an excision of the volar ganglion cyst of the left wrist and a release of the first dorsal compartment on August 12, 2003.
18. On August 22, 2003, Dr. Osier instructed Plaintiff to continue wearing her wrist splint and noted that her pathologies were consistent with a ganglion cyst. On September 12, 2003, Plaintiff returned to Dr. Osier for a post-op visit, continuing to have pain in the right wrist. Dr. Osier recommended therapy for both hands and mentioned the possibility of right wrist surgery. Plaintiff was unable to pursue therapy due to her financial status.
19. On July 21, 2003, Plaintiff filed a Form 33 request for hearing. Defendants filed its Form 33R on October 15, 2003, denying Plaintiff's right wrist claim by stating, "Regarding the alleged injury of May 20, 2003, the Defendants deny the employee suffered an injury by accident and further contend that work was available for her."
20. As of October 13, 2003, Dr. Osier recommended that Plaintiff's left hand and wrist condition should be improved before pursuing right wrist surgery. She gave Plaintiff a splint for the right wrist and Lidoderm patches for the left wrist. Dr. Osier recommended no lifting greater than one to two pounds with both hands on a repetitive basis.
21. On October 21, 2003, Dr. Osier released Plaintiff to work with restrictions of no lifting greater than five pounds and no pushing or pulling greater than two pounds with both wrists.
22. On November 13, 2003, Dr. Osier opined that Plaintiff was at maximum medical improvement with regard to the left wrist and assigned a five percent (5%) disability rating. She still recommended right wrist surgery.
23. Dr. Osier testified to a reasonable degree of medical certainty that Plaintiff's left wrist condition was a result of her May 5, 2003 incident at work. Dr. Osier testified that a contributing factor of Plaintiff's de Quervain's tendinitis of the left wrist was her job duties of grabbing, lifting patients, and using her thumbs throughout the day.
24. As of the date of the hearing, Plaintiff testified that her left wrist was doing better although she still had some tightness and soreness and at times when lifting objects she feels a little pain. Plaintiff testified that she experiences some pain in her right wrist that limits her everyday activities such as sweeping, washing the dishes, getting in and out of the bath tub, and reaching to scratch her back. Plaintiff is right-hand dominant. Plaintiff did not have any problems with either of her wrists prior to May 5, 2003.
25. Plaintiff did not return to work with Defendant-Employer. Plaintiff began job search efforts in October 2003 and eventually obtained the services of State Vocational Rehabilitation.
26. In early November 2003, Plaintiff was hired by Home Health Connection as a Certified Nursing Assistant in the capacity of an In-Home-Aide in a home care setting earning $8.00 per hour. Plaintiff was given temporary assignments until approximately February 2004, when she was given a permanent assignment.
27. Plaintiff testified that her benefits at Home Health Connection are less than what she had while working with Defendant-Employer. For example, she is not entitled to overtime and sick time. She is also not able to make up time missed from work. In addition, Plaintiff does not earn wages equal to or greater than her average weekly wage.
28. Plaintiff saw Dr. Osier again on December 29, 2003, for ongoing right wrist pain. She was given an injection to help alleviate her symptoms. Dr. Osier suggested an MRI if the pain continued. On January 30, 2004, Plaintiff was still having pain in her right wrist. Dr. Osier's impression of the symptoms was "Right hand work-related pain of the first dorsal compartment and FCR tendon." Dr. Osier ordered an MRI of the right wrist and hand.
29. Dr. Osier testified that the symptoms and conditions associated with Plaintiff's right hand were causally related to the combination of overuse of the right hand on May 20, 2003, as a result of Plaintiff's left hand injury and limitations, along with wearing a brace on the right wrist.
30. Due to the denial of her claims by Defendants, Plaintiff was unable to have the MRI performed by her next appointment with Dr. Osier. She saw Dr. Osier again on March 8, 2004, with continuing right wrist pain. Dr. Osier was unable to diagnosis Plaintiff's right wrist condition due to the lack of the MRI.
31. Plaintiff, through State Vocational Rehabilitation sponsorship, was able to proceed with the MRI on April 18, 2004. The results revealed unusual cystic or erosive change within the trapezium. The features were nonspecific, meaning no features of generalized synovitis or other evidence of inflammatory arthritis was evident. No osteonecrosis or definite ligamentous injury was identified.
32. Dr. Osier testified that the MRI results did show that Plaintiff had some arthritic type changes at the base of the thumb, but clinically, Plaintiff had problems related to de Quervain's tendinitis.
33. On April 23, 2004, Plaintiff saw Dr. Osier for re-evaluation of her ongoing right wrist pain. She was given a diagnostic injection. No evidence of a ganglion cyst was found on the right wrist.
34. Plaintiff returned to Dr. Osier on June 25, 2004, for continued right wrist pain, stating that the pain was something with which she could handle. Dr. Osier opined that Plaintiff's symptoms were coming from the CMC joint and did not recommend surgery. However, Dr. Osier stated that should Plaintiff remain significantly impaired, CMC joint arthroplasty would be discussed. Dr. Osier assigned restrictions of no lifting greater than five pounds with the right hand occasionally.
35. Plaintiff has failed to prove by the greater weight of the evidence that she sustained an injury by accident or an occupational disease on May 5, 2003, or May 20, 2003. Plaintiff contends that she is only proceeding under an injury by accident theory; however, neither the May 5, 2003, nor the May 20, 2003 incidents constitute accidents. On both dates, Plaintiff was performing her normal work duties under normal working conditions and, therefore, her injuries would not constitute accidents under the Workers' Compensation Act.
36. Dr. Osier's testimony that Plaintiff contracted bilateral de Quervain's tendinitis, which was predominantly caused by repetitive use of her thumbs, by grabbing, grasping, pulling and pushing at work, does establish a causal connection between her work and the gradual onset of her conditions. Plaintiff has not shown that her job duties placed her at an increased risk of developing de Quervain's tendinitis.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff failed to establish that she suffered an injury by accident on either May 5, 2003 or May 20, 2003, as defined by the North Carolina Workers' Compensation Act. An injury is only compensable under the Act if it was caused by "accident." See N.C. Gen. Stat. § 97-2(6);see also Poe v. Acme Builders, 69 N.C. App. 147, 149, 316 S.E.2d 338,340 (1984). An injury that occurs under normal work conditions, no matter how serious the injury, is not considered an injury caused by "accident" and is not compensable under the Act. See Poe, 69 N.C. App. at 152,316 S.E.2d at 342.
2. De Quervain's tendinitis is not an occupational disease specifically enumerated under N.C. Gen. Stat. § 97-53. Therefore, Plaintiff must proceed under N.C. Gen. Stat. § 97-53(13) in order to have her claim found to be compensable. To prove a compensable occupational disease pursuant to N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that her condition meets three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the [Plaintiff] is engaged," (2) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation," and (3) there is a "causal connection between the disease and the [Plaintiff's] employment" in that the employment significantly contributed to or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp., 308 N.C. 85,93, 301 S.E.2d 359, 365 (1983). The first two requirements of this test are met if Plaintiff can show that the employment created an increased risk of contracting the particular disease than the general public. Id.
at 94, 301 S.E.2d at 365. There is no evidence in the medical depositions that Plaintiff's job put her at an increased risk over the general public of developing a ganglion cyst or de Quervain's tendinitis. Thus, Plaintiff has not proven she suffered a compensable occupational disease under N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claims for compensation are DENIED.
2. Each side shall bear its own costs.
This the ___ day of September 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN